**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:21-CR-00750-1 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JOSEPH CHAVEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In November 2020, during a traffic stop, two Chicago Police Department officers found a firearm underneath the passenger seat of a Dodge sedan—the passenger was Joseph Chavez. R. 39, Mot. Suppress ¶ 8.[1] Chavez is now charged with being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1); R. 1, Indictment. Chavez moves to dismiss the charges, arguing that his alleged possession of the firearm did not substantially affect interstate commerce. R. 40, Mot. Dismiss at 1. Chavez also moves to suppress the firearm because (1) there was no reason for the initial traffic stop; (2) the officers' stop-and-frisk was unreasonable under the Fourth Amendment; (3) there was no probable cause to search the car; and (4) Chavez was arrested without probable cause. R. 39, Mot. Suppress ¶ 3. For the reasons discussed in this Opinions, both motions are denied.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

# I. Background

For purposes of deciding the suppression motion, the facts narrated here are undisputed. The factual details are based on video recording from officer body cameras, the arrest report, and the parties' briefing. On November 1, 2020, around 8:10 p.m., Chicago Police Officers Christopher Flores and Dominique Conner were patrolling in the Brighton Park neighborhood of Chicago, Illinois. R. 56, Gov't Resp. to Mot. Suppress at 1–2. They stopped a Dodge Dart after the driver failed to signal continuously for not less than the last 100 feet before making a turn—a violation of § 9-40-200 of the Chicago Municipal Code.[2] *See* R. 56, Gov't Exh. 4, Arrest Report at 3.

After the car stopped, Officer Flores approached the driver's side and spoke with the driver, Marlene Johns. R. 52, Gov't Exh. 2, Flores Video at 2:00–4:25. Flores asked Johns for her license; Johns responded that she did not have her physical license on her but would provide her name and address. *Id.* at 2:00–2:50. She told Flores that she was the aunt of the car's owner, John Perez, who was seated behind her. *Id.* at 3:50–3:56, 4:20–4:25. She also reported that Joseph Chavez, who sat in the front passenger seat, was Perez's father. *Id.*

Meanwhile, Officer Conner approached the sedan's front passenger door and saw an open bottle of beer between Chavez's legs. R. 53, Gov't Exh. 2, Conner Video at 1:55–2:10. Conner asked Chavez for his identification and whether there was anything else in the car besides the open container. *Id.* at 2:10–2:12. Chavez responded

---

[2]Failing to signal continuously less than the last 100 feet before making a turn is also a violation of 625 ILCS § 11-804(b).

no. *Id.* at 2:13. Conner then replied, "So, if we take you guys out of this car and search this car, we not goin' find nothin' in it?" *Id.* at 2:15–2:17. Chavez shook his head in response, *id.* at 2:17–2:21, so Conner again asked Chavez if there was anything in the car. *Id.* at 2:20–2:30. Chavez said nothing. *Id.* Instead, Chavez opened the glovebox and handed the registration papers to Perez, who handed them to Officer Flores. *Id.*

Moments later, the officers directed the occupants out of the car. Flores Video at 3:30, 4:36; Conner Video at 3:20. After patting Perez down, Flores moved Johns and Perez to the rear of the sedan. Flores Video at 4:40–5:00. He handcuffed Perez's right wrist to Johns' left wrist. *Id.* at 5:12–5:23. Conner also patted Chavez down and moved him to the rear of the sedan with Johns and Perez. Conner Video at 3:40–4:45. After handcuffing Chavez's left wrist to Johns' wrist at the rear of the car, Conner told all three occupants that they were being detained but were not under arrest. *Id.* at 4:50–5:03. Conner stayed with them and patted Johns down, *id.* at 5:38–5:52, while Officer Flores began searching the sedan. Flores Video at 5:27; Conner Video at 5:10.

As Flores searched the car, Officer Conner spoke with Johns and Perez, including telling them why the sedan was stopped and was being searched. Conner Video at 5:00–7:55. Conner said that Johns had failed to signal within the 100 feet before Johns made a right turn at the intersection. *Id.* at 7:24–7:32. In response, Johns apologized and said she thought it was a stop sign, not a traffic light. *Id.* at 7:32-7:41. Conner also told Johns that the officers directed the occupants out of the vehicle because they discovered an open container of beer in Chavez's lap. *Id.* at 7:50–7:56.

3

During Officer Flores' search, he saw two open beer bottles in the console cup holders of the sedan and found a loaded .40 caliber semiautomatic pistol (later identified as a Springfield Armory model XD-40 handgun). Flores Video at 6:30–8:18; *see* Indictment at 1. Flores then handcuffed Chavez behind his back at the rear of the sedan. *Id.* at 8:30–8:37. Seeing this, Johns asked, "What's going on?" and asked Chavez directly, "What did you have on you?" Conner Video at 8:17–8:25. Chavez protested, saying that the vehicle was not his and instead belonged to Perez. *Id.* at 8:26–8:30. Officer Conner responded, "Is that why you were shakin' when we pulled you over, man? … I saw you visibly shakin' when we pulled you over bro." Conner Video at 8:33–8:40. Perez then said to Chavez, "Don't blame me, man", and Officer Flores told Chavez, "I'm about to show you why you were shakin." *Id.* at 8:40–8:42.

Flores then removed the pistol from underneath Chavez's passenger seat and held it up so all the occupants could see it. Flores Video at 8:50–9:10. During the search and immediately after, Perez exclaimed to Chavez, "What did you have on you? C'mon man! I'm supposed to be in school, man." Conner Video at 8:42–8:50. Johns also exclaimed to Chavez, "Are you kidding me? Why the fuck would you have that [gesturing at the gun] bro?" *Id.* at 8.54–9.14. Officer Conner assured both Perez and Johns that neither of them would be in trouble. *Id.* at 8:47–8:52. Conner also repeatedly told Chavez that he was "literally shaking" when Conner had earlier approached him. *Id.* at 9:50–10:05. The entire traffic stop lasted around 10 minutes. *See* Flores Video; Conner Video.

After Chavez's arrest, Officer Conner attested to a report describing the traffic violation that led to stopping the sedan, the open container found in Chavez's lap, his nervous behavior, and the ensuing search and seizure of the pistol underneath Chavez' seat. Arrest Report at 3. Chavez has been charged with possession of a firearm by a felon. 18 U.S.C. § 922(g)(1). Chavez now moves to suppress the firearm[3] and to dismiss the charges.

## II. Analysis

### A. Motion to Dismiss

First up is the motion to dismiss the indictment. To challenge the sufficiency of an indictment, a defendant may file a pretrial motion (so long as the motion can be decided without a trial on the merits). Fed. R. Crim. P. 12(b)(3). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged ...." Fed. R. Crim. P. 7(c)(1). To be legally sufficient, an indictment must accomplish three things: "(1) state the elements of the offense charged; (2) fairly inform the defendant of the nature of the charge so that he may prepare a defense; and (3) enable the defendant to plead an acquittal or conviction as a bar against future prosecutions for the same offense." *United States v. Khan*, 937 F.3d 1042, 1049 (7th Cir. 2019). An indictment should align with the words of the statute, if the statute specifies the elements that constitute the offense. *United States v. Anderson,* 280 F.3d 1121, 1124 (7th Cir. 2002).

---

[3]The arrest report says that Chavez received *Miranda* warnings after his arrest. Chavez does not seek to exclude any post-arrest statements.

Chavez first argues that the indictment against him should be dismissed because the charging statute, 18 U.S.C. § 922(g)(1), is purportedly unconstitutional under the Commerce Clause. *See* Mot. to Dismiss ¶¶ 3–10, 14–15. Section 922(g)(1) makes it "unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess "any firearm or ammunition." As Chavez acknowledges, *see* Mot. to Dismiss ¶ 7, the Seventh Circuit has consistently rejected challenges to § 922(g) under the Commerce Clause, because "the jurisdictional element of § 922(g) provides the required nexus with interstate commerce." *United States v. Van Sach*, 458 F.3d 694, 703 (7th Cir. 2006) (cleaned up) (citing cases).[4]

Chavez advances arguments that do not come close to overcoming this authority. He cites *United States v. Lopez*, 514 U.S. 549 (1995) to contend that "possession of a firearm is not economic activity that has any impact on interstate commerce[.]" Mot. to Dismiss ¶ 2. But this claim has been repeatedly rejected by the Seventh Circuit, which binds this Court. In *United States v. Sarraj*, the Seventh Circuit explained that it has "specifically addressed whether the Supreme Court's *Lopez* decision narrowed the scope of section 922(g)(1), and [the Seventh Circuit has] repeatedly found that it did not." 665 F.3d 916, 921 (7th Cir. 2012) (citing cases).

---

[4] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Chavez next contends that his actions did not affect interstate commerce. Mot. to Dismiss ¶ 10. He asserts that he was never alleged to "have purchased the weapon, offered the weapon for sale or otherwise exchange it for value." *Id.* The government, however, need not allege those elements to establish the required interstate connection under § 922(g)(1). Instead, the Court may infer that the gun traveled in interstate commerce "merely by evidence that the gun was manufactured outside the state in which it was possessed[.]" *United States v. Humphreys*, 468 F.3d 1051, 1053 (7th Cir. 2006). Chavez's knowledge of whether the gun traveled interstate is irrelevant. *Sarraj*, 655 F.3d at 921. He "need not have been involved with bringing the gun into the state" nor possess the gun soon after it traveled across state lines. *Id.*

Here, the indictment alleges that Chavez "did knowingly possess" a "loaded Springfield Armory XD-40 .40 caliber semiautomatic pistol" that "had traveled in foreign or interstate commerce prior to" Chavez's possession of the firearm. Indictment at 1. That is all that is needed to survive a motion to dismiss, especially where possession satisfies the interstate nexus requirement so "long as a firearm moved across state lines at *some* point prior to the defendant's possession of it[.]" *United States v. Rice*, 520 F.3d 811, 815 (7th Cir. 2008) (emphasis added). Even a gun manufactured and sold in Illinois could meet this requirement "via various histories of travel, trade, or use." *Sarraj*, 655 F.3d at 923 n.5. Given this, the government has pleaded a legally sufficient indictment. Of course, at trial the government must be prepared to prove the firearm's interstate connection, whether by its manufacture outside of Illinois or otherwise.

Finally, Chavez urges the Court to apply the rule of lenity in determining whether § 922(g) applies. Mot. to Dismiss ¶¶ 11–13. The rule of lenity "applies only when, after consulting traditional canons of statutory construction, [the Court is] left with an ambiguous statute." *Shular v. United States*, 140 S. Ct. 779, 787 (2020) (cleaned up). The statute must contain "*grievous* ambiguity or uncertainty," where the Court "can make no more than a guess as to what Congress intended." *Ocasio v. United States*, 578 U.S. 282, 295 n. 8 (2016) (cleaned up) (emphasis added). There is no ambiguity to resolve in § 922(g). As explained earlier, the jurisdictional element of § 922(g) provides the required connection with interstate commerce. *Van Sach*, 458 F.3d at 703. The motion to dismiss is denied.

## B. Motion to Suppress

Next up is the suppression motion. A motion to suppress evidence must be raised at the pretrial stage if it can be determined without a trial on the merits. Fed. R. Crim. P. 12(b)(3). "It is a well-established rule that the burden is on the movant to make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed." *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (cleaned up). But "once the defendant establishes a basis for his motion to suppress," "the burden shifts to the government to prove by a preponderance of the evidence that the statement at issue was given voluntarily." *Id.*

Chavez argues that the gun found in the car must be suppressed for four reasons: (1) the officers lacked reasonable suspicion or probable cause for the traffic stop; (2) the officers lacked reasonable suspicion or probable cause to detain and frisk him;

(3) the officers lacked probable cause to search the car; and (4) the officers lacked probable cause to arrest him. Mot. Suppress ¶¶ 3–8, 16, 24–28, 31–34. Each contention is discussed in turn in a moment, but first the Court explains why no evidentiary hearing is needed. *See* Mot. Suppress ¶ 35.

For suppression motions, courts are required to conduct an evidentiary hearing only when "a substantial claim is presented" and "there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). To obtain an evidentiary hearing, the defendant "bears the burden of making a prima facie showing of illegality." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). The defendant's allegations must be "sufficiently definite, specific, non-conjectural and detailed." *Curlin*, 638 F.3d at 564 (cleaned up).

Here, the defense has not submitted a disputed issue of material fact. The parties and the Court have the benefit of video recordings of the interactions at issue. For his part, Chavez has *not* submitted an affidavit or any other evidence to contradict the videos, or otherwise demonstrate that a hearing is warranted. Rather, he advances several facts that actually do not conflict with the government's version of events. For example, Chavez does not dispute with *evidence* that Johns committed a traffic violation—he says only that no footage of the violation was captured and neither Johns nor any passengers were cited for the violation. Mot. Dismiss ¶ 4. Similarly, Chavez does not dispute any of the material facts set forth in the arrest report. He never denies carrying an open container of alcohol in the passenger seat or exhibiting nervous mannerisms when questioned by the officers. Arrest Report at 3; *see*

9

Mot. to Dismiss ¶ 5. Perhaps Chavez held back any factual proffer to avoid an obstruction of justice or perjury accusation. But the bottom line is that no evidentiary hearing is needed.

### 1. Initial Stop

Moving on to Chavez's contentions, first up is whether Officers Conner and Flores had reasonable suspicion to initiate a traffic stop. The Fourth Amendment protects individuals against unreasonable searches and seizures. Even so, "an investigatory stop, which constitutes only a limited intrusion into an individual's privacy, is reasonable, and therefore permissible, if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016) (cleaned up). Reasonable suspicion requires "more than a hunch," but need not rise to the more-demanding standard of probable cause. *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Mays*, 819 F.3d at 955 (cleaned up). The evaluation of the circumstances is "based on common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Here, the government contends that Officers Conner and Flores had reasonable suspicion to stop the car because Johns failed to timely engage a turn signal and

thus violated the Chicago Municipal Code. *See* Gov't Resp. to Mot. Suppress at 10–12. Reasonable suspicion of a traffic offense—even one as anodyne as not timely putting on at turn signal—is enough to support an investigatory stop. *See, e.g.*, *United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015) ("Because Mr. Shields does not dispute that he violated the Chicago Municipal Code by parking in the cross walk, the officers clearly had an objective basis to believe that he was violating the law."); *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("Probable cause exists when the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.") (cleaned up).

The government argues that the officers had reasonable suspicion to believe that the driver of the car violated § 9-40-200(b) of the Chicago Municipal Code, which requires drivers to signal continuously "during not less than the last 100 feet traveled by the vehicle …." *See* Gov't Resp. to Mot. Suppress at 1–2. According to the officers, they saw the driver of the vehicle turn at an intersection before traveling 100 feet with her turn signal on. Arrest Report at 1. When Johns asked why she was stopped, Officer Conner told her just that, explaining that Johns used her turn signal only "when [she] got to the light …." Gov't Exh. 2 at 7:20–7:32. Johns then apologized and explained that she believed she turned at a stop sign, not a traffic light. *Id.* at 7:34–7:41. (It is not clear why stop-sign versus traffic-light makes a difference.) Given that the officers relied on their first-hand knowledge in observing the traffic violation, as supported by the reaction of Johns and the later memorialization in the arrest report

(plus the absence of evidence offered by Chavez), the Court concludes that the officers had reasonable suspicion for the initial traffic stop.

## 2. Detention and Frisk

Next, Chavez argues that the officers improperly ordered him out of the car, frisked him, and then handcuffed him during the investigatory stop. Mot. Suppress ¶¶ 6, 17. The challenge against ordering Chavez out of the car is a non-starter. Police officers conducting a valid traffic stop "may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011). So ordering Chavez out of the car poses no Fourth Amendment problem given the valid traffic stop.

Moving on to the frisking and handcuffing, if an officer has a reasonable suspicion that the driver or passenger may be armed and dangerous, then the officer may also frisk that individual. *Id.* To determine if a suspicion was reasonable, the question "is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that [the officer's] safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The use of handcuffs during a *Terry* stop-and-frisk is permissible "where police officers can point to specific reasons for believing that handcuffing the particular person during the stop was needed for safety or to prevent flight." *United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013). But "when particularized suspicion is lacking, restrictive means of detention generally run afoul of the Fourth Amendment." *Id.*

The government offers two reasons for frisking Chavez, handcuffing him, and then searching the car: (1) the officers observed an open container of beer on his lap after they pulled the vehicle over, Arrest Report at 3, and (2) the officers observed Chavez "visibly shaking with trembling hands and breathing heavily." *Id.* The government is right that these facts are enough to justify what the police did. First, Officer Flores' observation that Chavez was transporting an open bottle of beer in violation of Illinois law, 625 ILCS 5/11-502, gave the officers "probable cause to believe that the car contained additional contraband or evidence." *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992). So the officers could justify a search of the car (this is explained in more detail below). But they would be doing so in the presence of Chavez, and there was reason to believe that he had been drinking the beer. This fact gave the officers greater reason to worry that he "might do something unpredictable, unwise, and dangerous." *Ford*, 872 F.3d at 415; *see United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) (same).

Second, adding to the risk to officer safety was Chavez's nervous behavior in visibly shaking and breathing heavily. After all, a "display of nervousness is frequently recognized as a sign that a suspect has something to hide, including a weapon." *Patton*, 705 F.3d at 740. Not only would the nervousness point to Chavez having something to hide, it would reasonably lead officers to believe that he might act dangerously in reaction to a search. In *United States v. Lewis*, the Seventh Circuit held that a defendant's nervous behavior during an interaction with an officer, such as trembling hands and heavy breathing, contributed to the totality of circumstances

13

that give "rise to objective reasonable suspicion." 920 F.3d 483, 493 (7th Cir. 2019). So too here. Chavez does not dispute he acted nervously during the interaction with Officer Conner. And, because reasonable suspicion is an objective standard, Conner would still be justified in ordering Chavez out of the vehicle, handcuffing, and frisking him "even if [Chavez] always breathes heavily, with constantly trembling hands." *Id.* at 493. The combination of the open-beer container and Chavez's nervousness gave the officers reasonable suspicion to frisk and then cuff him.

In response, Chavez argues that, even if the officers had reasonable suspicion for the initial stop, his Fourth Amendment rights were violated because the officers unreasonably prolonged the stop to search his car. Mot. Suppress ¶¶30–33. It is true that a "traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of stop. *Lewis*, 920 F. 3d at 491 (quoting *Rodriguez v. United States*, 575 U.S. 348 (2015)). But officers are permitted to engage in "ordinary inquiries incident to the traffic stop," such as checking the driver's license and confirming proof of insurance. *Rodriguez*, 575 U.S. at 355 (citing *Illinois v. Caballes*, 543 U.S. 405, 408) (cleaned up). As evident in the body camera footage, the officers observed the open container in Chavez's lap immediately after requesting identification from Johns and Chavez. *See* Flores Video at 2:00–2:10; Conner Video at 2:00–2:05. Officer Conner noticed Chavez's nervous behavior when she questioned him about whether there were additional illicit substances in the car. Arrest Report at 3. The facts giving rise to suspicion (which in turn justified the frisking and cuffing) arose quickly and early on during the stop. The stop was not unlawfully prolonged.

14

Chavez also specifically objects to the officers' use of handcuffs after the frisk because it was not the "least intrusive means reasonably available" and was equivalent to placing him in custody. Mot. Suppress ¶¶ 25, 27. Although the use of handcuffs "is not a normal part of a *Terry* stop, it does not automatically turn a *Terry* stop into an unlawful arrest." *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010). Instead, courts have "sustained the use of handcuffs during *Terry* stops when the circumstances suggested ... that an individual stopped for questioning might have a weapon." *Rabin v. Flynn*, 725 F.3d 628, 639 (7th Cir. 2013) (citing cases). Here, the totality of circumstances justifies the use of handcuffs against Chavez and the other passengers during the stop-and-frisk. The officers had particularized suspicion of danger given the open beer can and Chavez's nervousness, so the officers detained but did not arrest Chavez. There were also two other occupants that the officers needed to detain—so the officers were outnumbered—which "made the use of handcuffs all the more reasonable." *Muehler v. Mena*, 544 U.S. 93, 93 (2005). This issue would be a "much closer call" if Conner had *immediately* handcuffed Chavez, then performed the frisk, all before observing that Chavez had an open beer container in his lap or that he appeared nervous. *See United States v. Smith*, 2019 WL 4242505, at *5 (N.D. Ill. Sept. 6, 2019), *aff'd*, 32 F.4th 638 (7th Cir. 2022). But, because Conner was reasonably justified in her concern for her safety, the use of handcuffs on Chavez during the seizure did not transform it into an arrest. *Id.*

### 3. Search of the Car

Chavez next contends that the officers had no basis to search the car because there was no reasonable suspicion or probable cause for the search. Mot. Suppress ¶¶ 7, 16, 32, 33. In response, the government argues the officers had reasonable suspicion to conduct a protective search of the vehicle, Gov't Resp. to Mot. Suppress at 14–15. Not only did officers have reasonable suspicion to conduct the protective search, but (as noted earlier) they actually likely had probable cause to search the vehicle.

On the protective search, if an officer has a reasonable suspicion that a vehicle's occupant is armed or may be able to gain immediate control of a weapon, then the officer may conduct a protective search of the passenger compartment for accessible weapons. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 344 (2009); *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983); *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004). But the officer must have "specific, articulable facts which, in combination with inferences to be drawn from those facts, reasonably warrant the intrusion." *United States v. Fryer*, 974 F.2d 813, 819 (7th Cir.1992); *Long*, 463 U.S. at 1049. The reasonableness of the search is balanced by the degree of the intrusion against the government's rationale for the search. *See United States v. Knights*, 534 U.S. 112, 118-19 (2001).

Here, again, the combination of the open container of beer and Chavez's nervous behavior—so nervous that he was visibly shaking—was sufficient to engage in a protective search. *See United States v. Whitaker*, 546 F.3d 902, 911 (7th Cir. 2008). If

the officers had left Chavez and the passengers without performing the inspection, then they "could have jeopardized their own safety" and those in the surrounding areas. *Id.* Moreover, although a display of nervousness alone is usually insufficient to support a finding of probable cause, it can be evidence that a suspect may be hiding a weapon. *United States v. Lyons*, 733 F.3d 777, 782 (7th Cir. 2013) (cleaned up); *see also United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010). So, Chavez's nervousness and the presence of an open container of alcohol gave rise to a "fair probability" that there was additional evidence of a crime in the car, at the least of other open-alcohol violations. The automobile exception permits warrantless searches of cars when police have "probable cause to believe it contains evidence of criminal activity." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (citing *Arizona*, 556 U.S. at 338); *see also U.S. v. Williams*, 627 F.3d 247, 251 (2010). "Probable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Charles*, 801 F.3d 855, 860 (2015). A proper search needs only a "fair probability" that contraband or evidence of a crime would be found, not "absolute certainty of such a discovery …." *Williams*, 627 F.3d at 251.

Here, the officers already had observed evidence of a crime—the open beer container—and had probable cause to believe that there could be more evidence in the car. At the very least, there was probable cause to believe that more alcohol would be in the car. *United States v. McGuire*, 957 F.2d 310 (7th Cir. 1992) (holding that when an officer found an open container of alcohol in the vehicle, he had "probable cause to

believe that the car contained additional contraband or evidence," and thus had "authority to search every part of the vehicle and its contents that could conceal additional contraband, including the area beneath the passenger seat and the trunk"). The search of the car was supported either as a protective search or under the automobile exception.

### 4. Arrest

Finally, Chavez argues that there was no probable cause to arrest him. Mot. Suppress ¶¶ 8, 18–19, 34. Probable cause for an arrest exists when "a reasonable person, knowing all of the facts and circumstances known to the officer, would believe that the individual in question has committed or is committing a crime." *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019). Here, the open container of alcohol in Chavez's lap gave officers probable cause to arrest him. "By itself this obvious violation of law would have justified denying [Chavez's] motion to suppress." *United States v. Ford*, 872 F.3d 412, 415 (7th Cir. 2017); *see Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (concluding a police officer may arrest someone who has committed "even a very minor criminal offense in his presence"). But, for completeness' sake, there was also probable cause to believe that Williams unlawfully possessed a firearm after the officers found one in the sedan.

It is true that neither Illinois nor Chicago criminalizes all gun possession in public. Not surprisingly, mere gun possession standing alone cannot establish probable cause (setting aside gun possession that is illegal in certain areas, such as in a liquor store, 720 ILCS 5/24-1(a)(8)). *United States v. Watson*, 900 F.3d 892, 896 (7th

18

Cir. 2018) (explaining that, when a 911 caller reported "boys ... playing with guns" in a parking lot, no probable cause existed in part because gun possession by itself was not inherently unlawful). The facts in this case, however, go well beyond mere gun possession. When gun possession is paired with evasive or other suspicious conduct, probable cause can be found. *See United States v. Dancy*, 640 F.3d 455, 462 (1st Cir. 2011) (probable cause to arrest defendant during investigatory stop when officer felt gun in pocket and defendant resisted attempts to secure it); *United States v. Bennett*, 604 Fed. App'x 11, 13 (2d Cir. 2015) (summary order) (probable cause where defendant lied to officers and they observed him place a gun in a doorway and attempt to flee); *United States v. Johnson*, 432 Fed. App'x 118, 121 (3d Cir. 2011) (non-precedential opinion) (probable cause where defendant fled from police and discarded firearm during flight); *United States v. Goss*, 537 Fed. App'x 276, 280 (4th Cir. 2013) (unpublished disposition) (probable cause based on tip about a gun plus defendant's flight and tossing gun in bushes); *United States v. Joseph*, 445 Fed. App'x 301, 304-5 (11th Cir. 2011) (unpublished opinion) (probable cause where defendant fled and reached in waistband, refused commands to stop, sought refuge on a roof, and tossed a dark object later discovered to be a gun).

Here, the Illinois Firearm Concealed Carry Act, 430 ILCS 66/ *et seq.*, sets forth the requirements for obtaining a concealed-carry license:

> The Department [of State Police] shall issue a license to carry a concealed firearm under this Act to an applicant who: (1) meets the qualifications of Section 25 of this Act; (2) has provided the application and documentation required in Section 30 of this Act; (3) has submitted the requisite fees; and (4) does not pose a danger to himself, herself, or others, or a threat to public safety as

determined by the Concealed Carry Licensing Review Board in accordance with Section 20.

430 ILCS 66/10. The qualifications referred to in Section 25 of the Act are substantial: applicants must undergo 16 hours of firearms training with various certification requirements, as well as fingerprinting, photographing, a written application, application fee, and other background and administrative checks. 430 ILCS 66/25, 66/30, 66/35, 66/75. Given these requirements, a law enforcement officer in Illinois who encounters a person with a concealed firearm would not necessarily assume that the possession is legal, especially when combined with Chavez's behavior.

Specifically, in this case there was more than mere possession. Remember that before searching the car, Officer Conner repeatedly asked Chavez if there was anything in the vehicle other than the open container of alcohol. Conner Video at 2:10–2:30. The defendant first said "no" but then declined to respond. *Id*. After Officer Flores recovered the loaded firearm from under Chavez's seat, Conner confronted Chavez about his previous denials. Conner Video at 8:33–8:40. Before Flores revealed that what he had found was a firearm, Chavez responded by exclaiming that the vehicle belonged to his son, not him. *Id*. at 8:26–8:30. When Flores ultimately showed the firearm to the vehicle's occupants, the other occupants denied ownership of the gun. *Id*. at 8:54–9:14. Instead, they attributed the firearm to Chavez and implied that he had messed up (and they were none too happy about it). *Id*. Moreover, Officer Conner pointed out that Chavez was "literally shaking when [she] walked up to the car." *Id*. at 9:50–10:05. Indeed, during all this, Chavez never explicitly denied that

20

the gun was his or that he was shaking during the encounter. There was probable cause to arrest Chavez for unlawful gun possession based on this evasive and suspicious conduct.

## IV. Conclusion

For the reasons explained above, Chavez's motion to dismiss and motion to suppress are denied. The parties shall confer with one another (and defense counsel shall confer with the Defendant) on the next step of the case and file a written status report on September 22, 2022.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 1, 2022